No. 24-3233

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

CHELSEY DUDLEY,

Plaintiff-Appellant,

v.

BOISE STATE UNIVERSITY; TONY ROARK in his official and individual capacity; MANDY NELSON in her official and individual capacity; KATE LAW in her official and individual capacity; JOELLE POWERS, in her official and individual capacity; JOHN BUCKWALTER, in his official and individual capacity; CHRISTOPHER HYER, in his official and individual capacity; ROGER MUNGER, in his official and individual capacity; GUNNAR WHISLER, in his official and individual capacity; KELSIE ZAK, in her official and individual capacity; EMMA FORD, in her official and individual capacity; MIKE DIXON, in his official and individual capacity;

Defendants-Appellees.

_____

On Appeal from the United States District Court for the District of Idaho,
Case No. 1:22-cv-00495-DCN,
Hon. David C. Nye

_____

**APPELLANT'S OPENING BRIEF**

_____

Jeremiah M. Hudson, ISB No. 8364
Fisher Hudson Brown Horton
1109 W. Main St., Ste. 600, Boise, ID 83702
Telephone: (208) 345-7000
Facsimile: (208) 514-1900
jeremiah@fisherhudson.com

Attorney for Plaintiff-Appellant
Chelsey Dudley

1

**TABLE OF CONTENTS**

STATUTORY AND REGULATORY AUTHORITIES ..............................................5

INTRODUCTION & SUMMARY OF THE ARGUMENT ...................................9

JURISDICTIONAL STATEMENT ..................................................................10

ISSUES PRESENTED...................................................................................10

STATEMENT OF THE CASE.........................................................................12

   1.    Dudley's Verified Complaint and Request for TRO/Preliminary Injunction 18

   2.    District Court's TRO Extension Denial.........................................................19

   3.    Resuming the Student Conduct Process And Grade Appeal .........................22

   4.    Amended Complaint and Motion to Dismiss .................................................32

   5.    District Court's Motion to Dismiss Order .....................................................33

      a.    District Court Held That Students Have No Property Interest In Their Previously Earned Credits/Degrees ..................................................................33

      b.    District Court Ruled That Notice And Hearing Are Not Required When Disciplining Students With Grade Changes Or Degree Revocation ................35

      c.    District Court Held That Student Conduct Process Provided Sufficient Process Without Analyzing the *Mathews* Factors.............................................36

ARGUMENT ....................................................................................................39

1.    STANDARD OF REVIEW ........................................................................39

2.    DUDLEY'S PROPERTY INTEREST ...........................................................40

3.    DUDLEY'S OCCUPATIONAL LIBERTY INTEREST ..............................45

4.    INSUFFICIENT PROCESS ........................................................................47

    a.    District Court Erred In Holding That Dean Roark Could Change Dudley's Grade, Leading to Revocation of Her BSW Degree, Without Notice Or Hearing. .........................................................................................................47

    b.    Conduct Board's Sanction of Degree Revocation Was To Retroactively Ratify Dean Roark's Decision Under The Guise Of Providing Process. .........50

    c.    The Student Conduct Process Was Fundamentally Unfair Considering The Extraordinary Sanctions Imposed. ....................................................................51

5.    QUALIFIED IMMUNITY ..........................................................................61

6.    PERMANENT INJUNCTIVE RELIEF .........................................................63

7.    PRELIMINARY INJUNCTIVE RELIEF ......................................................64

    a.    Standard of Review .......................................................................64

    b.    Argument .........................................................................................64

CONCLUSION ....................................................................................................68

STATEMENT OF RELATED CASES ....................................................................69

CERTIFICATE OF COMPLIANCE FOR BRIEFS ................................................69

CERTIFICATE OF SERVICE ...................................................................................69

## <u>STATUTORY AND REGULATORY AUTHORITIES</u>

### <u>U.S. CONSTITUTION</u>

Due Process Clause of the Fourteenth Amendment to the U.S. Constitution .....9, 40

### <u>FEDERAL STATUTES</u>

28 U.S.C. §1291 ...............................................................................................10

28 U.S.C. §1331 ...............................................................................................10

28 U.S.C. §1343 ...............................................................................................10

### <u>FEDERAL CASES</u>

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023)........................................ 63, 64, 66, 67

*Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012)..................................... 40, 41, 62

*Barry v. Barchi*, 443 U.S. 55 (1979) ........................................................................41

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................39

*Bell v. Burson*, 402 U.S. 535 (1971) ......................................................................48

*Black Coalition v. Portland School Dist. No. 1*, 484 F.2d 1040 (9th Cir. 1973)56, 66

*Bd. of Cur. of Univ. of Missouri v. Horowitz*, 435 U.S. 78 (1978)........ 21, 37, 51, 65

*Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564 (1972) 20, 35, 40, 41, 47, 62, 66

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022) .............................................................................................64

*City of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015) ............................61

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ...................... 20, 48, 66

*DeBoer v. Pennington*, 287 F.3d 748 (9th Cir.1987) ......................................... 43, 44

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990) ..................................................................................................................59

*DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655 (9th Cir. 1992)......................39

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ....................................................... 56, 66

*Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019) ........................................54

*Doe v. University of Mississippi*, 361 F.Supp.3d 597 (S.D.Miss., 2019)..................53

*Doe v. University of Sciences*, 961 F.3d 203 (3rd Cir. 2020)............................ 56, 66

*Engquist v. Or. Dept. of Agriculture*, 478 F.3d 985 (9th Cir. 2007).................. 45, 46

*Goldberg v. Kelly*, 397 U.S. 254 (1970)...................................................................59

*Goss v. Lopez*, 419 U.S. 565 (1975)............................................... 21, 41, 51, 54, 65

*Hydrick v. Hunter*, 669 F.3d 937 (9th Cir. 2012) ...................................................61

*Jones v. Bd. of Governors of University of North Carolina*, 704 F.2d 713 (4th Cir. 1983) ..................................................................................................................55

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)....................................................39

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ............................... 41, 43, 62

*Mathews v. Eldridge*, 424 U.S. 319 (1976)..................... 9, 38, 41, 47, 51, 52, 55, 65

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978)..............................41

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008)...............38

*Merritt v. Mackey*, 827 F.2d 1368 (9th Cir. 1987) ............................................. 46, 62

*Morales v. Fry*, 873 F.3d 817 (9th Cir. 2017) .........................................................61

*Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir. 2009) .........................................39

*Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091 (9th Cir. 2008)...............64

*Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019) .................................................61

*Ohio Bell Tel. Co. v. Public Utilities Comm'n of Ohio*, 301 U.S. 292 (1937) .........59

*Park v. Temple University*, 757 Fed.Appx. 102 (3rd Cir. 2018) ..............................58

*Perry v. Sindermann*, 408 U.S. 593 (1972).................................... 20, 40, 43, 62, 66

*Powell v. Montana State University*, 2018 WL 6728061 (D.Mont., 2018)(unpublished)..............................................................................................53

*Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707 (9th Cir. 2022)............. 64, 67

*Saucier v. Katz*, 533 U.S. 194 (2001).....................................................................62

*Strosnider v. City of Nampa*, 196 F.Supp.3d 1159 (D.Idaho, 2016) ......................62

*Ta Chong Bank Ltd. v. Hitachi High Techs. America, Inc.*, 610 F.3d 1063 (9th Cir. 2010) .........................................................................................................39

*United States v. Caceres*, 440 U.S. 741 (1979).......................................................55

*Walker v. City of Berkeley*, 951 F.2d 182 (9th Cir. 1991) ......................................58

*Zimmerman v. City of Oakland*, 255 F.3d 734 (9th Cir. 2001) ..............................50

7

*Zinermon v. Burch*, 494 U.S. 113 (1990) ....................................................................48

## RULES

Federal Rule of Civil Procedure 12(b)(6) ....................................................... 38, 39

Federal Rule of Civil Procedure 15(a)(2) ..............................................................39

Federal Rule of Civil Procedure 8(a)(2) ...............................................................39

## STATE STATUTES

Idaho Code §33-3006...........................................................................................44

Idaho Code §54-3206............................................................................ 12, 45, 52

## STATE CASES

*Wickstrom v. North Idaho College*, 111 Idaho 450 (Idaho,1986) ..................... 43, 44

### **INTRODUCTION & SUMMARY OF THE ARGUMENT**

This case is about whether, under the Due Process Clause of the Fourteenth Amendment, an administrator at a public university can unilaterally discipline a former student by retroactively giving her a failing grade in a required course several months after she was given a passing grade in the same course and conferred a college degree—resulting in degree revocation without a notice or hearing.

In its Memorandum Decision and Order on Defendants/Appellees' Motion to Dismiss ("MTD Order"), the district court erred in ruling that university students in Idaho do not have protected interests in their previously conferred degrees, their course credits, their potential future enrollment, or in the university's disciplinary process. Additionally, the district court erred in denying Appellee, Chelsey "Brooke" Dudley ("Dudley") the opportunity to amend her Complaint.

Second, the district court erred in its alternate conclusion, holding that Dudley (1) was not entitled to notice or a hearing prior to being deprived of her previously conferred BSW degree and course credits in violation of BSU policy since there was a subsequent appeal process, and (2) was given sufficient process in a subsequent Student Conduct Process that expelled her and purported to revoke her degree for a second time by rejecting Dudley's allegation that the process was designed to retroactively ratify the initial revocation of Dudley's degree, and without analyzing the *Mathews* factors for additional protections given the extraordinary sanctions

9

imposed. The district court's flawed analyses led it to erroneously conclude that Appellees were entitled to qualified immunity and to dismiss Dudley's claim for injunctive relief.

Lastly, the district court's conclusions in its Memorandum Decision and Order regarding the extension of the Temporary Restraining Order ("TRO Extension Denial") constituted an abuse of discretion when it based its decision on both erroneous legal standards and on clearly erroneous factual findings.

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction over Dudley's claims pursuant to 28 U.S.C. §1331 and §1343. This Court has jurisdiction under 28 U.S.C. §1291 because Dudley appeals from a final order dated May 3, 2024, which dismissed Dudley's complaint and all of her claims. ER-2. Dudley timely filed a notice of appeal on May 17, 2024. ER-548-550.

## ISSUES PRESENTED

1.      Whether the district court erred in dismissing Dudley's due process claims by holding that she did not have a property interest in the degree that Boise State University had previously conferred to her, the credits for courses she previously completed, her ability to enroll at Boise State University in the future, or in BSU's disciplinary process.

2.      Whether, alternatively, the district court erred in concluding that Dudley was not entitled to notice or a hearing prior to Dean Roark imposing punishment by retroactively giving her a failing grade in a required class in violation of BSU's policies six months after Dudley had graduated, leading to revocation of her BSW degree.

3.      Whether the district court erred in concluding that the subsequent student conduct process that was based on the exact same alleged conduct and alleged policy violations cited by Dean Roark to subsequently impose degree revocation, as well as expulsion, to retroactively satisfy the requirements of Dean Roark's failure to provide Dudley with notice and due process.

4.      Whether the district court erred in failing to consider the *Mathews* factors when considering whether any additional protections were warranted in the Student Conduct Process considering the severity of the proposed sanctions.

5.      Whether the district court erred in holding that Defendants/Appellees were entitled to qualified immunity.

6.      Whether the district court erred in holding that Dudley was not entitled to a preliminary injunction when BSU took disciplinary action against Dudley without prior notice or opportunity to be heard.

11

## STATEMENT OF THE CASE

On May 7, 2022, after having passed all of her require courses, including a senior internship ("SOCWRK 481") at the Idaho Department of Health and Welfare ("IDHW"), Dudley graduated from Boise State University's ("BSU") School of Social Work with a bachelor's degree in social work ("BSW degree"). ER-155(¶84).

On July 14, 2022, Dudley took the Idaho licensed social worker examination, which she passed, and on August 24, 2022, she received her BSW license. ER-155(¶85). Dudley's BSW degree is required to become a licensed social worker. *See* Idaho Code §54-3206. Dudley was thereafter employed as a licensed social worker for the State of Idaho. *See* ER-172-173 (¶ 182.d).

Dudley has had, over the last decade, an overly contentious relationship with an individual named Audrey, who is occasionally in a relationship with the father of Dudley's children ("Pat"). *See* ER-231-232, 244.[1] Audrey contacted IDHW on occasion during Dudley's senior internship to express concerns over Dudley potentially having access to Audrey's IDHW files. Just prior to Dudley's graduation, Audrey began engaging in text message conversations with Mike Dixon, IDHW's Child Welfare Chief ("Chief Dixon"), where she alleged her suspicion that Dudley might have accessed Audrey's IDHW file. *See* ER-237-254. Audrey told Chief

---

[1] Dudley adds this context in light of the district court's adoption of the underlying allegations against Dudley.

Dixon that, in a conversation between Dudley and Pat, Dudley conveyed that she knew details about Audrey's personal life. *See* ER-233, 237-254. Chief Dixon seemingly believed her, not understanding that Pat has conveyed a lot of information to Dudley about Audrey over the years and that it is not uncommon for Audrey to post allegations of physical and emotional abuse against her ex-husband and others on her public social media pages. *Id*. In <u>July of 2022</u>, Audrey requested that Chief Dixon punish Dudley. *Id*. Chief Dixon said he could not since Dudley's internship had already concluded.[2] *See* ER-233. Audrey then called IDOPL asking them to revoke Dudley's BSW license, which they refused since the allegations occurred prior to Dudley's licensure. *Id*. Audrey then contacted BSU around <u>September 27, 2022</u>, requesting that BSU take action against Dudley. *Id;* ER-251-253. Around <u>October 11, 2022</u>, Dean Roark spoke with Chief Dixon about the allegations for the first time. ER-233.

On <u>November 2, 2022</u>, in BSU's first communication with Dudley regarding the allegations, Dean Roark, the newly-appointed Interim Dean for BSU's School of Social Work, sent Dudley a letter stating:

> The School of Social Work has been made aware of actionable events that occurred in the course of your Spring 2022 clinical internship for SOCWRK 481, Social Work Field Practicum II. Specifically, the Idaho Department of Health and Welfare

---

[2] Chief Dixon was aware of the allegations prior to Dudley receiving her final grade in SOCWRK 481 and Dudley's graduation, but he did not reach out to Dudley's instructor or anyone at BSU. *See* ER-233.

13

(IDHW) has conveyed the results of an investigation establishing beyond doubt that you accessed confidential client information within IDHW's database, information in files you had no authorization to view and in which you had no legitimate business interest. The date, time, and file ID of each viewing was recorded in IDHW's system and subsequently documented by IDHW's IT department. These acts could not have been accidental, and I am aware that you were notified of IDHW's having discovered and documented your conduct of improperly accessing this client information.

Each incident of accessing such information was in violation of the School's field requirements, the NASW Code of Ethics, the Student Professional Conduct and Professional Standards, Boise State's Student Code of Conduct, IDHW's expectations for employees and interns, and state and federal privacy laws.

In light of these serious, intentional, and repeated violations, your grade for SOCWRK 481 will be changed from a passing grade of 'P' to a failing grade of 'F'. As a consequence of this grade change, you have not satisfied the graduation requirements for the BSW degree, rendering your transcript invalid. You will be contacted by the Office of the Registrar under separate cover regarding actions to be taken in consequence of this fact.

You may appeal this decision and action by following University Policy 3130, Grade Appeals. Additionally, the matter has been referred to the Office of the Dean of Students for possible discipline under University Policy 2020. You will be notified shortly by the Office of the Dean of Students as to any charges to be brought pursuant to Policy 2020 and the process related to those charges.

ER-155-56 (¶87). On November 3, 2022, Dudley received a letter from

Mandy Nelson, BSU's Registrar ("Registrar Nelson"), stating "you no longer satisfy

14

the graduation requirements for a Bachelor of Arts in Social Work. Thus, your degree has been rescinded." ER-156 (¶89).

On November 9, 2022, BSU's registrar's office sent Dudley's revised transcript to IDOPL stating that Dudley no longer had her BSW degree. ER-156 (¶90). Up to that point, no one from BSU had contacted Dudley to discuss the allegations. ER-157 (¶93).

While Dean Roark's November 2nd Letter stated that Dudley could appeal his grade change, BSU's Policy 3130 specifically contemplates a student appealing a grade assigned by a course instructor, not a grade changed by an administrator for disciplinary purposes, as reflected in its required procedure and permitted reasons for appeal.[3] Policy 3130 was established "to protect objectivity and fairness in assigning, administering, and evaluating student academic performance" and that "[f]aculty members carry the responsibility to observe and judge all aspects of a student's academic performance." Additionally, Policy 3180, which is BSU's procedure for changing a final course grade, only permits an "instructor of record" or a student to initiate a change to a final letter grade, and only a student to initiate a change to a final pass/fail grade. ER-155 (¶79). Dean Roark was not Dudley's

---

[3] If necessary, Dudley intends to seek leave to amend her Complaint to add specific allegations pertaining to Policy 3130, which are not currently in the record.

15

instructor of record, and changing Dudley's final SOCWRK 481 grade to punish her violated Policies 3130 and 3180. ER-156 (¶¶91-92).

As Dean Roark indicated in his November 2nd Letter, On <u>November 17, 2022</u>, Kate Law, Associate Dean in BSU's Office of the Dean of Students ("AD Law"), who was the administrator and investigator for the Student Conduct Process, sent Dudley a Notice that BSU had initiated a charge against her based on the same allegations ("First Notice"). ER-407-408. The First Notice set a pre-hearing meeting for November 29, 2022 and a hearing date for December 12, 2022. *Id*. The First Notice stated, in relevant part:

> […] The information we received indicates that the following Student Code of Conduct section(s) may have been violated:
>
> Section 4/AC. Violation of University Policy and/or Law
>
> These allegations stem from an incident on April 12, 2022 in which it is alleged that the Idaho Department of Health and Welfare (IDHW), through an investigation, concluded you accessed confidential client information within IDHW's database, reviewing information in files you had no authorization to view and in which you had no legitimate business interest. The date, time, and file ID of each viewing was recorded in IDHW's system and subsequently documented by IDHW's IT department. Accessing confidential information was found to be in violation of the School of Social Work's field requirements, the NASW Code of Ethics, the Student Professional Conduct and Professional Standards, and IDHW's expectations for employees and interns, and state and federal privacy laws, the result of which may violate the student code of conduct – specifically University Policy and or Law.

16

*Id*. AD Law copied much of the same language, nearly verbatim, from Dean Roark's November 2nd Letter. *See* ER-155-156 (¶87). One significant difference was that AD Law identified a specific date of the alleged violation—April 12, 2022—and a specific University Student Code of Conduct Policy Dudley allegedly violated, Policy 2020 §4.AC "Violation of University Policy and/or Law." ER-407-408. Policy 2020 §4.AC, which is the last violation among twenty-nine (29) others in BSU's Student Code of Conduct, is BSU's catch-all violation that prohibits students from "[v]iolating any University policy, rule, regulation, requirement, directive or contract, whether published electronically or in hard copy, and/or violating any local, state or federal law" (hereafter referred to as "underlying policies or laws") ER-146 (¶¶33-34).

Unlike the other Policy 2020 violations, where the prohibited conduct is specifically described in the policy section, to conclude that a student violated Policy 2020 §4.AC, BSU must first identify the underlying policies or laws that the student allegedly violated. *See Id*. The First Notice did not provide any specific underlying policies or laws that Dudley allegedly violated, and to date, none have been disclosed to her. *See* ER-407-408.

On November 29, 2022, Dudley attended the pre-hearing meeting with her attorney, AD Law, and an attorney for BSU. ER-158-159 (¶109). At the meeting, AD Law informed Dudley of the following: (1) that BSU intended to pursue sanctions

17

of degree revocation and expulsion; (2) that Dean Roark's grade change and the subsequent degree revocation would stand even if Dudley prevailed in the Student Conduct Process; and (3) that BSU did not intend to call any witnesses against Dudley at the hearing. *Id*.; ER-488 (¶44). At the time, Dudley had seen no evidence against her. ER-487 (¶42). Dudley was not asked to address the allegations at the meeting ER-158-159 (¶109). Later, Dudley, through counsel, requested additional time to prepare her defense, which was denied. ER-400-401.

1. **Dudley's Verified Complaint and Request for TRO/Preliminary Injunction**

On <u>December 7, 2022</u>, Dudley filed a Verified Complaint for Injunctive Relief (ER-481-496) and Plaintiff's Motion and Memorandum for Temporary Restraining Order And/Or Preliminary Injunction (ER-464-480), seeking an injunction requiring BSU to (1) reinstate Dudley's grade and BSW degree that had been revoked without prior notice or hearing and to send IDOPL transcripts reflecting the reinstatement (ER-474-475); (2) set a new hearing date that gave Dudley adequate time to prepare her defense; (3) provide Dudley with the underlying policies or laws that formed the basis for BSU's conclusion that Dudley violated Policy 2020 4.AC; (4) allow Dudley to be represented by an attorney and to present Dudley's defense and to question witnesses; and (5) to require that BSU present its witnesses at the hearing for cross-examination. ER-477.

On <u>December 9, 2022</u>, the district court granted a temporary restraining order ("TRO") that prevented BSU from conducting the December 12, 2022 student conduct hearing, concluding that:

> Given the severity of the allegations and punishments Defendants seek to impose upon Dudley, it appears that procedural safeguards are required before Dudley can either be forced to defend herself at the Student Conduct Hearing, or before her apparent property right in her degree and reputation can be revoked.

ER-392. The district court stated, "[a]s a State Institution, BSU is required to comply with the Constitution, and unraveling the result of a constitutional violation, if any, would likely force BSU to incur far greater time and expense than would postponing the hearing while the preliminary injunction is adjudicated." ER-393. The district court set a date for BSU to respond to Dudley's motion, and a hearing for <u>December 20, 2022</u> to address whether the TRO should be extended. ER-395.

On <u>December, 19, 2022</u>, BSU responded to Dudley's motion, arguing that Dudley could not establish a protected interest, and that she was unlikely to succeed in in her lawsuit—focusing primarily on the underlying allegations against Dudley. *See* ER-189-203.

### 2. **District Court's TRO Extension Denial**

On <u>December 21, 2022</u>, the district court issued its TRO Extension Denial. ER-32-49. In it, the district court expressed skepticism that Dudley had a property interest in her BSW degree, but presumed she did for its analysis. ER-40-44.

The district court held, with regards to the allegations against Dean Roark, that "the Court cannot say at this stage that Dudley has shown a likelihood of success on her due process claim as it relates to the grade change / diploma recission when the process is, frankly, ongoing"—referencing the appeal process under Policy 3130 that Dean Roark cited in his November 2nd Letter. ER-44. The court recognized that Dudley "asked for the Court to reinstate her grade and degree until she is given her due process," and acknowledged that "it appears Defendants *may* have circumvented certain provisions of [Policy 3180]," but incorrectly concluded that the "full text of University Policy 3180 is not in the record"[4] and "[t]he Court simply does not know" whether there are other BSU Policies that might have authorized Dean Roark's conduct. ER-43 (emphasis in original). The Court reasoned that:

> [R]einstating [Dudley's] degree while she goes through the process would seem to usurp the University's Processes. Similarly to when a person is terminated, though there may be circumstances where the decision is held in abeyance pending review, the review usually happens after the termination.

---

[4] A complete copy of Policy 3180 was in the record. ER-398 (¶15); ER-412-414.

ER-45 (fn7).[5] Regarding the Student Conduct Process, the district court held that "Defendants identified the policies Dudley is alleged to have violated in the information packet provided to her on December 7, 2022, and provided her with the evidence they intend to rely upon"—implying that BSU's reference to Policy 2020 §4.AC was sufficient without requiring BSU to disclose the underlying policies or laws that were the basis of BSU's conclusion. ER-46-47.

The district court held that "Dudley is allowed to question witnesses," but she could only question BSU's witnesses "if they are willing to testify."[6] ER-47. The district court concluded that "[i]t appears that BSU's process complies with the requirements of *Goss* that the student be given notice and an explanation of the evidence against her and also provides the careful and deliberative review process *Horowitz* requires." ER-47 (citing *Goss v. Lopez*, 419 U.S. 565 (1975); *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 85 (1978)). The district court did not address the differences between the 10-day suspension imposed in *Goss* and the degree revocation and expulsion Dudley faced, nor did it recognize that the

---

[5] The U.S. Supreme Court held in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) that it "has been settled for some time now" that due process "requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* (citing *Board of Regents v. Roth,* 408 U.S., at 569–570); *Perry v. Sindermann,* 408 U.S. 593, 599 (1972).

[6] BSU's witnesses were unwilling to testify, as detailed, below.

"careful and deliberate" standard in *Horowitz* applies to academic decisions that do not require a notice and hearing, as opposed to disciplinary decisions. *See Id*.; ER-46-48.

The district court instructed that "[o]nce the administrative processes have concluded, the parties should apprise the Court and a determination regarding briefing on the Preliminary Injunction can be made." ER-49. Given the rulings set forth in the TRO Extension Denial, it was unclear why the district court postponed the preliminary injunction briefing until after the Student Conduct Process given that Dudley's request was for the district court to reinstate her grade and BSW degree that BSU had already deprived Dudley of without notice or hearing, and to prevent further due process violations during the Student Conduct Process. *See* ER-470-478. Accordingly, and with the district court's approval, Dudley would later file her First Amended Complaint following the Student Conduct Process, as set forth below.

### 3. Resuming the Student Conduct Process And Grade Appeal

Pursuant to the district court's direction in its TRO Extension Denial, Dudley appealed Dean Roark's change to her final SOCWRK 481 grade under Policy 3130. *See* ER-157 (¶¶94-97). Her appeals to Dean Roark, and his superiors, Appellee Powers and Appellee Buckwalter, were all denied. *Id*.

On January 9, 2023, AD Law sent Dudley a Notification of Formal Conduct Hearing ("Second Notice") that set a hearing date for February 17, 2023. The Second

Notice was substantially similar to the First Notice (collectively "Notices"). *See* ER-159 (¶113).

On February 7, 2023, Dudley asked AD Law if BSU still intended to seek specific punishments against Dudley at the hearing. ER-168 (¶156). AD Law responded, "Boise State does not prescribe sanctions based on incident, but as it has been elevated to a hearing, sanctions could include up to suspension or expulsion, for current students, or revocation of a degree. However, ultimately the decision is made by the board." *Id*. This led Dudley to believe that BSU had reconsidered asking the Conduct Board to impose specific sanctions, and that expulsion could not be imposed because Dudley was not a current student. ER-168 (¶157).

In the days before the original hearing date, Dudley learned that she would be limited to 25 minutes to present her entire defense to both the alleged violation and sanctions.[7] *See* ER-217-218. Dudley informed AD Law that she would need more time, and asked for 45 minutes to present her case, 25 minutes to question each witness, and 45 minutes for a summation. ER-169 (¶158). AD Law refused, saying that the process "[…] should be conducted within a reasonable amount of time." *Id*.

Dudley informed AD Law that she would like to call the Student Conduct Administrator/Investigator as a witness, which, at the time, Dudley believed to be

---

[7] This included ten (10) minutes to give an opening presentation, ten (10) minutes to present witnesses, and five (5) minutes for a summation. ER-169 (¶158).

AD Law, but was uncertain. ER-169 (¶159). AD Law refused, stating, "[b]ased on our policy, this would not achieve providing new information." *Id*.

On February 10, 2023, AD Law provided a hearing packet that contained an Investigation Report and evidence, and included an "Incident Report" stating that the "Incident" was reported on November 2, 2022[8] and occurred on April 12, 2022; a "Summary of Complaint"; a section called "Individuals and Parties Involved"; "Summary of Text Messages"; "Timeline of Events"; a "Class Search" printout showing details for SOCWRK 481; and a section entitled "Standards of Behavior," among other things (collectively referred to as "Investigation Report"). ER-160 (¶¶115,118). Dudley had received a similar hearing packet in the days leading up to the original hearing. *See* ER-209-304. The information in both hearing packets were similar, but there were some significant differences, as explained below.

The Summary of Complaint stated as follows:

### Summary of Complaint

It was reported to the Office of the Dean of Students that while completing a field practicum at the Idaho Health and Welfare office for the Bachelor of Social Work program, Brooke Dudley inappropriately accessed confidential files regarding people she knew in her personal life. This information was first discovered by an unaffiliated individual (Audrey) after Brooke intimated via text messages that she knew private and sensitive information regarding Audrey's family records with IDHW and Child Protective services. Some records specifically involve

---

[8] It is reasonably inferred that Dean Roark made the report. *See* ER-155-156 (¶87).

> information about a minor (Audrey's child). Brooke and Audrey both have children with the same man (Pat).
>
> Audrey initiated a complaint with IDHW, The Division of Occupational and Professional License (DOPL), and Boise State University regarding the inappropriate access of her private records. This spurred an investigation by IDHW and the Office of the Dean of Students. Each incident of accessing confidential information was in violation of the Boise State's Student Code of Conduct and IDHW's expectations for employees and interns, and state and federal privacy laws.

ER-166-167 (¶149). The last sentence in the "Summary of Complaint" and "Incident Report" had been revised from a prior version to exclude the conclusion that Dudley had violated "the School of Social Work's field requirements, the NASW Code of Ethics, [and] the Student Professional Conduct and Professional Standards." *Id*. (¶¶149-150). The prior version was a verbatim recitation from Dean Roark's November 2nd Letter. *See Id*.; ER-155-156 (¶87).

The Investigation Report described little about the investigation process, including who was interviewed, who provided evidence, or how conclusions were made. *See* ER-162-163 (¶¶127, 131-132). The only evidence provided to Dudley that she had violated "IDHW's expectations for employees and interns, and state and federal privacy laws" was Paragraph 11 of Chief Dixon's December 1, 2022 Affidavit, stating:

> Conducting a search of records in ESPI for individuals known personally to the searcher is unethical and a violation of the confidentiality standards of the

25

> Department of Health and Welfare. Child Protection files and information are confidential pursuant to IDAPA and may only be accessed for a legitimate work purpose.

ER-167-168 (¶152). AD Law's Investigation Report contained bolding and italicization to persuasively emphasize Chief Dixon's alleged belief that, had the allegations come forward earlier, Dudley's internship would have been terminated. ER-161 (¶123).[9] AD Law's Investigation Report showed that Chief Dixon knew about the allegations prior to the end of Dudley's internship, despite Chief Dixon's contrary assertion. *See* ER-233. It failed to explain whether Chief Dixon had a supervisory role over IDHW interns. It included inflammatory accusations unrelated to the allegations against Dudley, including that Dudley alleged that Audrey had STIs, Dudley allegedly using a derogatory name when referring to a child, and Pat's belief that Dudley was "intoxicated while outside his house, in a car when she is threatening to remove sleeping children from his home." ER-161-162 (¶124).

Dudley received no evidence supporting the conclusion that the alleged misconduct occurred on April 12, 2022, despite its reference in the Notices and the Incident Report. ER-161 (¶¶122, 140). Her internship log showed that she did not work at IDHW on April 12, 2022. *See* ER-271.

---

[9] For example, AD Law bolded and italicized "***fireable offense***" and italicized "*This would have been reason for immediately ending her internship.*" ER-161 (¶123).

Dudley was provided no evidence supporting the conclusions in AD Law's Notices or Dean Roark's November 2nd Letter showing that "the date, time [or] file ID" of each alleged viewing from IDHW's system. ER-155-156, 159 (¶¶87,113). The only documentation Dudley received that was purportedly from IDHW was a heavily redacted, one-and-a-half page spreadsheet, which is accurately represented by the following:

IDHW documentation showing private records accessed by Brooke Dudley

| Contact Id | Middlename | Lastname | Firstname | Client Id |
|---|---|---|---|---|
| fb0599f1-1f91-e911-a979-001dd80081ad | | | | |
| ecb3ba25-2291-e911-a979-001dd80081ad | | | | |
| fd55ee69-2391-e911-a979-001dd80081ad | | | | |
| fa319d23-2591-e911-a979-001dd80081ad | | | | |
| 21123c24-3391-e911-a979-001dd80081ad | | | | |
| 818ba3af-4eb9-e911-a982-001dd80081ad | | | | |
| ab8ba3af-4eb9-e911-a982-001dd80081ad | | | | |
| ea41a540-2091-e911-a97b-001dd800951b | | | | |
| b5586f70-2091-e911-a97b-001dd800951b | | | | |
| d37cdc38-2191-e911-a97b-001dd800951b | | | | |

ER-164 (¶136). The columns "Middlename," "Lastname," "Firstname," and "Client Id" were redacted throughout the entire spreadsheet. *See Id.*; *see also* ER-273-274. The information in the "Contact Id" column was incomprehensible for determining whether Dudley engaged in any conduct or violated any underlying policy or law. *Id*. AD Law's Investigation Report explained the redactions as follows:

14. **November 17th, 2022:** IDHW provides documentation showing when Brooke accessed the confidential records Audrey and Pat. (Heavily redacted for Audrey and Pat's privacy).

ER-164 (¶139). In concluding that this spreadsheet was proof of Dudley's alleged misconduct, AD Law failed to explain why the same first names she

27

identified could not be un-redacted so that Dudley and the Conduct Board could confirm the accuracy of AD Law's conclusion. *See Id*. It is unclear why AD Law believed the IDHW spreadsheet showed "*when* [Dudley] accessed the confidential records." *See Id*.; ER-164 (¶136)(emphasis added).

AD Law did not identify any witness interviews she conducted other than a single "phone conversation with Audrey on 10/6/22." ER-162 (¶127).

At no point during the investigation did anyone from BSU ask to interview Dudley, ask if she could identify relevant evidence or witnesses, or ask her to review the Investigation Report prior to the final version being provided to the Conduct Board. ER-159-160 (¶¶110-111, 120). The entire weight of BSU's investigative power was focused on proving the same allegations that Dean Roark had already punished Dudley for. *See* ER-160, 168 (¶¶119, 155).

On <u>February 17, 2023</u>, Dudley attended the Conduct Board hearing, which lasted approximately one hour and twenty minutes. ER-169-170 (¶¶160-161). No witnesses attended on behalf of BSU. ER-170 (¶163). Dudley had previously asked Chief Dixon to testify at the hearing, but he stated that he would not unless subpoenaed to do so. ER-170 (¶¶164-165). Dudley asked AD Law to testify about her Investigation Report, but, again, she refused—claiming that she was attending the hearing as the administrator, and not as a witness. ER-170 (¶¶ 166-168). One

28

Conduct Board Member agreed with AD Law's reasoning, and none asked her to testify. ER-170 (¶¶168-169).

At the hearing, one of AD Law's co-workers from the Office of the Dean of Students acted as the Complainant ("DOS Complainant"). ER-158, 170 (¶109.b, 162). DOS Complainant argued that Dudley violated "the School of Social Work's field requirements, the NASW Code of Ethics, [and] the Student Professional Conduct and Professional Standards" during DOS Complainant's opening presentation. ER-170-171 (¶171). This surprised Dudley given that AD Law had recently revised the Summary of Complaint and Incident Report to exclude those particular allegations. *Id*. (¶171).

Dudley presented her defense in approximately 25 minutes, as required, but it was not enough time to address the evidence or lack thereof, dispute mischaracterizations and inaccurate statements in the Investigation Report and witness statements, to present her defense on the merits, and to address sanctions. ER-171 (¶¶172-173). At the hearing, Dudley disputed that she had searched the names of the two individuals she had been accused of searching, although she admitted that she had looked up herself and, although she had no specific recollection of doing so, she might have clicked on a hyperlink of caregivers attached to her file. ER-171 (¶¶174-177). Dudley disputed that there were any policies or laws that prohibited her from doing so or any user agreements that limited her access to

IDHW's database, and she explained that her IDHW supervisor had referenced records relating to the supervisors' family members when instructing Dudley to look at closed files for examples of how to draft reports for her internship—which is why she accessed her own file. *Id*.

Dudley asked DOS Complainant to identify the underlying policies or laws cited as the basis for BSU's conclusion that Dudley had violated Policy 2020 §4.AC. ER-171-172 (¶178). DOS Complainant stated that her role did not include knowing social work law, and cited witness statements that generally concluded that underlying policies and laws existed without specifically identifying them. *Id*. (¶¶178-179). Conduct Board Members expressed their belief that the underlying policies or laws did not need to be specifically identified as long as written witness statements generally concluded that underlying policies or laws existed that prohibited Dudley's alleged conduct.[10] ER-172 (¶182b-c). Conduct Board Members asked no questions of DOS Complainant, but they asked a substantial number of questions of Dudley—often expressing skepticism of her responses. ER-172-174 (¶¶180-182a-g). At the end of the hearing, DOS Complainant asked the Conduct

---

[10] Stated differently, it was the Conduct Board Members' belief that they could adopt Chief Dixon's written statement that "[c]onducting a search of records in ESPI for individuals known personally to the searcher is unethical and a violation of the confidentiality standards of [IDHW]" to conclude that IDHW had a written policy prohibiting Dudley's alleged conduct without the Conduct Board Members having any independent understanding of whether that policy actually existed when Dudley was an intern or what, exactly, it prohibited. ER-172 (¶182.b).

Board to revoke Dudley's degree and expel her. ER-174 (¶183). Following the hearing, AD Law and the Conduct Board Members deliberated. ER-174 (¶184). It can be reasonably inferred that AD Law discussed the allegations and helped them arrive at a conclusion. *See Id*.

On <u>March 1, 2023</u>, AD Law sent the Conduct Board's Decision to Dudley, which stated, in relevant part:

> The Conduct Hearing Board provided the following rationale: After deliberation, the Student Conduct Board has found you to be responsible for violating Section 4 AC - Violation of University Policy and/or Law. The Board determined that it is more likely than not that your actions were in direct violation of the ethical and professional standards and expectations that were set forth for you by the School of Social Work's field requirements, the NASW Code of Ethics, the Student Professional Conduct and Professional Standards, IDHW's expectations for employees and interns, and state/federal privacy laws. The Board determined that you used your position with IDHW to access database information beyond the scope of your role. The Board has also concluded that your actions were an egregious violation of policy (and notably trust), and that subsequently your role in your internship would have been terminated prior to its completion if the supplemented information had been revealed. Consequently, you would have not passed your internship or earned your degree from Boise State University. The Board ultimately rendered the decision of expulsion in addition to revocation of your degree due to the way in which your exhibited behavior fails to uphold the values and expectations befitting of the Boise State community, and is in direct violation of the Student Code of Conduct.
>
> In an effort to make a decision that is both a reasonable and appropriate response to the behavior you exhibited and the choices that you made, the Conduct Hearing Board imposes the following sanctions:

31

> 1. Revocation of Degree
> Start Date: Wednesday, March 15, 2023
> Per Boise State University Policy #2020, "a degree awarded by Boise State University may be revoked for fraud, misrepresentation, or other violations Boise State University standards of admission or degree, or for other serious violations committed by a student prior to graduation." Based on the severity of the violation which you were found Responsible for, the Conduct Hearing Board determined that your Boise State Degree Conferment should be revoked.
>
> 2. Expulsion
> Start Date: Wednesday, March 15, 2023
> This notice indicates that your relationship with the University as a student has now been terminated. You will be administratively withdrawn from any courses you may be enrolled in and an academic HOLD will be placed on your ability to register. You will not be eligible to re-enroll as a student for any future semesters.

ER-174-175 (¶185). The Conduct Board did not explain the basis for its conclusions, how it determined Dudley's alleged conduct rose to the level of a "serious violation" to justify degree revocation, how it concluded that the sanction of expulsion was appropriate, or why expulsion was appropriate for a former student. *Id*. It is reasonably inferred that expulsion was imposed so Dudley could not re-earn the single credit that Dean Roark had taken from her, or re-earn her BSW degree. *Id*.

Dudley unsuccessfully appealed the decision to AD Law. ER-175 (¶¶190-191).

### 4. **Amended Complaint and Motion to Dismiss**

On <u>July 11, 2023</u>, Dudley filed her First Amended Complaint for Injunctive Relief and Demand for Jury Trial, alleging that her right to due process was violated with Dean Roark's decision and the Conduct Board's subsequent decision, she alleged a Stigma-Plus claim against Chief Dixon, and a claim for injunctive relief. *See* ER-138-188. On <u>September 25, 2023</u>, Appellee/Defendants filed their Motion to Dismiss ("MTD"), claiming that Dudley had asserted no cognizable protected interests, that Dean Roark provided Dudley with sufficient process despite failing to provide notice and a hearing, that BSU had provided her sufficient process in the subsequent Student Conduct Process, that Dudley failed to state a Stigma-Plus claim against Chief Dixon, Defendants were entitled to qualified immunity, and Dudley's claim for injunctive relief should be dismissed. *See* ER-117-137.

**5. <u>District Court's Motion to Dismiss Order</u>**

The district court held a hearing on the Motion to Dismiss on <u>March 13, 2024</u>, and on <u>May 3, 2024</u>, it issued its MTD Order dismissing Dudley's Complaint. *See* ER-2-31.

**a. <u>District Court Held That Students Have No Property Interest In Their Previously Earned Credits/Degrees</u>**

The district court held that former students do not have a property interest in their degrees, course credits, potential future enrollment, or BSU's disciplinary process, and it denied Dudley the opportunity to amend her complaint, stating that

33

"[n]othing will change the fact that Idaho does not recognize a property interest in a college degree." ER-30. The district court held that "Dudley points to no state law or statute that vest in her a property interest in higher education," and "the Court has scoured Idaho's laws and statutes and cannot locate any authority that would allow her to proceed under such a theory." ER-19. The district court failed to address the crux of Dudley's argument that Idaho State Board of Education policies ("ISBOE") and BSU's policies were the basis of Dudley's property interests. *See* ER-91-95.

The district court cited several cases from the District of Idaho where the court often presumed students had property interests in education, but focused on a Fifth Amendment Takings Clause case where the district court held that the "the Idaho Constitution does not directly purport to establish an individual right" to education in Idaho. *See* ER-17-19 (quoting *Zeyen v. Boise Dist. #1*, 2023 WL 4215402 (D. Idaho June 9, 2023)). As explained below, BSU and ISBOE policies, when considering the Idaho statutes authorizing BSU and ISBOE to enact such policies, prevents the need to look directly at the Idaho Constitution or statutes as the source of the mutually explicit understandings giving rise to Dudley's property interest. Accordingly, the district court's cited case law does little to assist in the analysis of Dudley's property interest. *See Id*.

After concluding that Dudley had no property interest, the district court stated:

34

The Court could dismiss the case without further discussion. Such circumstances, however, put the Court in an awkward position. Continuing its analysis may seem to undercut its above holding. On the other hand, were the Court to end its analysis here and later be reversed as to its conclusion regarding a property interest, it would have to re-visit the case; thus incurring additional time and expense. There is no reason to go that route, however, because even assuming arguendo that Dudley had a property interest in her degree, her claims would still fail because BSU afforded her ample process and Defendants are entitled (for the most part) to qualified immunity.

ER-19-20. The district court then dismissed Dudley's occupational liberty interest claim, as explained more, below, and her Stigma-Plus claim against Chief Dixon, which Dudley has chosen not to appeal. ER-20-22.

b. **District Court Ruled That Notice And Hearing Are Not Required When Disciplining Students With Grade Changes Or Degree Revocation**

In the alternative, the district court concluded that Dean Roark could change Dudley's final SOCWRK 481 grade in violation of BSU's policies six months after her graduation, leading to Dudley's BSW degree revocation, without providing Dudley a notice or hearing because, "[w]hile there was no formal hearing for the grade change, Roark informed Dudley of the reasons why her grade was being changed […] and Dudley had an opportunity to appeal that decision to three different individuals at BSU." ER-25.

35

The district court failed to address Dudley's argument that notice and a hearing are required before depriving a person of their property interest. ER-102 (*citing Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70, (1972)). Rather, the district court concluded that "under the circumstances, the Court finds that regardless of whether Roark's decision was academic or disciplinary, the due process BSU afforded Dudley as to her grade change and the recission of her diploma was adequate." ER-25.

### c. District Court Held That Student Conduct Process Provided Sufficient Process Without Analyzing the *Mathews* Factors

With regards to the subsequent Student Conduct Process, the district court stated, "[t]hat Dudley did not like the exact procedures employed […] is not dispositive of anything. BSU is not required to comply with the demands of every student and how he or she believes the hearings should be conducted." ER-26. While the district court stated that "the Court is not implying BSU is free to ignore general principles of equity and fairness in its hearing process" (*see Id.*) it failed to address Dudley's argument that BSU did exactly that by imposing extraordinary sanctions while, among many other things, (1) denying Dudley more than twenty-five (25) minutes to present her entire defense; (2) denying her the ability to cross-examine witnesses against her when credibility was at issue; (3) refusing to provide her the specific underlying policies or laws that BSU allegedly used to conclude that Dudley

36

violated Policy 2020 §4.AC, and the Conduct Board's belief that they could adopt a witness's summary conclusion that underlying policies or laws existed without having any independent understanding of them; (4) failing to provide Dudley any opportunity to be involved with or provide her with sufficient information about BSU's investigation process; (5) withholding investigation emails that were clearly favorable to Dudley's defense while disclosing emails that supported the allegations;[11] (6) withholding evidence of the date of the alleged violation and other evidence cited in the Notices; (7) mischaracterizing evidence; (8) misleading Dudley to believe that only current students, which Dudley was not, could be sanctioned with expulsion; (9) the Conduct Board failing to ask questions of DOS Complainant but asking Dudley questions and expressing skepticism over her responses; (10) the Conduct Board adopting written witness statements from BSU witnesses without assessing credibility; (11) failing to identify the specific evidence the Conduct Board relied on in its conclusions or consider required factors while imposing sanctions, among many, many others. *See* ER-105-111.

The district court, again, misapplied the standard for academic decisions in *Horowitz*, 435 U.S. at 85, to conclude that "[s]o long as BSU provides notice of the

---

[11] After the hearing, Dudley submitted a public records request to IDHW and received investigation emails between BSU and IDHW where IDHW acknowledged that there were no policies or user agreements that prohibited Dudley's alleged conduct that had been conveyed to interns. ER-165-166 (¶¶142, 146)

disciplinary action (which it did in this case) and an opportunity to be heard (again, satisfied here) and its process is 'careful and deliberate' (which, by all accounts it was in this instance), the Fourteenth Amendment's Due Process considerations have been satisfied." ER-26 (FN 22).[12]

The district court adopted disputed facts in favor of BSU by asserting, for example, that "Dudley broke the contract by disobeying BSU's rules when she viewed information she did not have authorization to view." ER-16 (FN 15). The district court characterized Dudley's claims as an "orchestrated conspiracy to 'ratify' Roark's illegal decision" and summarily concluded that such an argument "falls flat considering multiple people in various positions at various levels (including volunteers) reviewed what took place." ER-27 (FN 23).

The district court failed to analyze any of the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) to determine whether the Student Conduct Process complied with Dudley's due process rights considering the extraordinary sanctions of degree revocation and expulsion. As addressed in more detail below, the district court also dismissed Dudley's claim for injunctive relief and held that Appellees were entitled to qualified immunity. ER-27-29.

---

[12] Dudley disputes the district court's characterization that Appellees' decisions were "careful and deliberate." *See* ER-168, 183-184 (¶¶155, 235, 240-241)); ER-103-104.

## ARGUMENT

### 1. STANDARD OF REVIEW

This Court reviews a district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) de novo.[13] *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1102 (9th Cir. 2008). In its analysis, the Court must accept "all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005); *see Ta Chong Bank Ltd. v. Hitachi High Techs. America, Inc.*, 610 F.3d 1063, 1066 (9th Cir. 2010).

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*,, 550 U.S. 544, 555 (2007)(quotations omitted).

To survive a Rule 12(b)(6) motion, a complaint "does not need detailed factual allegations," but Plaintiff's grounds of entitlement must provide more than labels, conclusions, or a formulaic recitation of elements. *Id*. "Factual allegations must be enough to raise a right to relief above the speculative level […] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. "[T]he

---

[13] Dudley has combined the standard of review pertaining to the district court's denial of the preliminary injunction in Section 7.a., below.

non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Hernandez v. City of San Jose*, 897 F.3d 1125, 1131–32 (9th Cir. 2018).

Federal Rule of Civil Procedure 15 provides that leave to amend should be "freely" given "when justice so requires." Fed.R.Civ.P. 15(a)(2); *See also DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

## 2. <u>DUDLEY'S PROPERTY INTEREST</u>

The Fourteenth Amendment of the U.S. Constitution prohibits the government from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, §1, cl. 3.

The question at issue is whether the district court erred in ruling that Dudley did not have a property interest under the due process clause in her previously conferred BSW degree, her previously earned credits, her potential future enrollment at BSU, or in BSU's disciplinary process.

For the purposes of procedural due process protection, property interests "are not limited by a few rigid, technical forms. Rather, property denotes a broad range of interests that are secured by existing rules or understandings." *Perry v. Sindermann,* 408 U.S. 593, 601 (1972) (quotation omitted). "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or

mutually explicit understandings that support [her] claim of entitlement to the benefit and that [she] may invoke at a hearing." *Id*.; *see also Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577 (1972). A claim of entitlement comes from "existing rules or understandings that stem from an independent source […]." *Id*.; *see also Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012). "The hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430 (1982).

Once an individual entitlement is found, "the types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'" *Id*.; *see also Barry v. Barchi*, 443 U.S. 55 (1979)(horse training license); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1 (1978)(utility service); *Goss v. Lopez*, 419 U.S. 565, 573–574 (1975)(high school education); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (disability benefits). "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Roth*, 408 U.S. at 577.

41

ISBOE and BSU's policies constitute official regulations of the State of Idaho. *See Barnes*, 669 F.3d at 1304.[14] The Idaho Constitution and Statutes vest control of BSU with ISBOE. *See* ER-144 (¶¶17-20). Under this authority, ISBOE promulgated Policy §§III.E.3, III.E.4, and III.B.2.iii.3. *See* ER-144 (¶¶17-22).

ISBOE Policy §III.E.1. states that "[c]ompletion of the program of instruction results in […] conferring of a degree upon the student by the faculty and the Chief Executive Officer." *See Id*. ISBOE Policy §III.E.3 states that BSU's "[i]nstitutional catalogs shall specify the required number of earned credits for each certificate and degree." ER-144 (¶21). BSU's institutional catalog sets forth the existing rules and understandings between BSU and its students regarding what students must accomplish to earn a degree. *See e.g.* ER-145-147, 155 (¶¶25-26, 35, 84). Dudley alleged that ISBOE and BSU established specific requirements to graduate with a BSW degree, and that Dudley achieved those standards, resulting in the granting of her BSW degree on May 7, 2022. *Id*.

ISBOE Policy §III.B.2.iii.3 states that "[i]n matters of disciplinary action, students have the right to due process and to be held accountable using academic

---

[14] In *Barnes*, the Eleventh Circuit held that "[…] Barnes's entitlement is established by both the Board's Policy Manual and the VSU Student Code of Conduct" which "constitute official regulations of the State of Georgia. The Georgia Constitution specifically vests control of the University System of Georgia with the Board. Ga. Const. art. VIII, § 4, para. I. Under this authority, the Board promulgated a Policy Manual." *See Id*.

42

standards and institutional procedures." ER-145 (¶24). ISBOE Policy §III.B.2.iii.3 creates a property interest in Dudley's final SOCWRK 481 grade, her BSW degree, BSU's disciplinary process, and her future enrollment—because it is an official regulation of the State of Idaho that (1) limits the substantive reasons BSU can discipline Dudley to those set forth in the "academic standards and institutional procedures," and (2) it expressly provides a due process right. *See Id*. When combined with BSU's "academic standards and institutional procedures," ISBOE Policy §III.B.2.iii.3 substantively limits BSU ability to discipline students to "for cause" reasons. *See Logan,* 455 U.S. at 430.

The "academic standards and institutional procedures," which specify the mutually explicit understandings that gives rise to Dudley's claims of entitlement (*See Sindermann*, 408 U.S. at 601), include, among many others, BSU Policy 2020 (substantive reasons for discipline) (ER-145-153 (¶¶28-72)); BSU Policy 3130 (requirements for appealing a final grade)(ER-155 (¶78)); BSU Policy 3180 (requirements to change final grade) (ER-155 (¶79)); BSU Policy 3230 (GPA calculation requirements) (ER-155 (¶80)); BSU Policy 3240 (reasons instructors may dismiss students from class)(ER-155 (¶81)); class syllabi, course standards, and written/verbal directions for assignments (ER-146 (¶¶32)). These standards and procedures limit the reasons BSU can impose discipline and dictate evaluation of academic performance. *See* ER 145-153, 155 (¶¶28-72, 32, 78-81, 83).

Further, the Idaho Supreme Court has held that "[i]t is by now well-settled that the principal relationship between a college and its students is contractual." *Wickstrom v. North Idaho College*, 725 P.2d 155, 157, 111 Idaho 450, 452 (Idaho,1986). Contractual interest receives substantive due process protection when "the deprivation constitutes a denial of a present entitlement." *DeBoer v. Pennington*, 287 F.3d 748, 749–750 (9th Cir.1987). A "present entitlement" is "a right by virtue of which [one is] presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation." *Id*. (citations omitted).[15]

Dudley alleged the rules and mutually explicit understandings that created her claims of entitlement and established her property interests in her BSW degree, course credits, potential future enrollment at BSU, and in BSU's disciplinary process. *See e.g.* ER-144-145, 155 (¶¶ 19, 24, 26-27, 79, 82, 84).

The district court's conclusion that students do not have due process or contractual rights in their previously conferred degrees indicates a fundamental misunderstanding of the relationship between a public university and its students. *See Wickstrom*, 111 Idaho at 452. The district court's conclusion means that universities can forego disciplinary hearings and allow administrators to unilaterally punish students based on any criteria they choose, or for no reason at all. It means

---

[15] Idaho Code §33-3006 gives ISBOE the authority to "grant academic degrees to those students *entitled* thereto." ER-144 (¶19)(emphasis added).

44

that graduates can lose their degrees or credits without notice or an opportunity to be heard. Universities controlled by partisan appointees or elected officials—some who view public universities as being at the forefront of culture wars—could use such a ruling to target certain graduates or groups of graduates for degree revocation by claiming, for example, that certain past courses or degree programs lacked sufficient academic merit. Such a standard, if upheld, would create a level of instability that current and former students never contemplated, and it would give prospective students pause before spending a significant amount of time and money in pursuit of a degree that could be stripped without reason or recourse.

For the foregoing reasons, Dudley requests that the Ninth Circuit reverse the district court's decision.

## 3. DUDLEY'S OCCUPATIONAL LIBERTY INTEREST

At issue is whether the district court erred in ruling that Dudley could not establish an occupational liberty interest because, as the district court held, Dudley "has not alleged she has been foreclosed entirely from her chosen profession" because "[p]resumably she could obtain the credits necessary for a social work degree from another institution and still obtain licensing in the state of Idaho." ER-21. In so holding, the district court rejected Dudley's position and adopted BSU's position without basis. *See* ER-84 (Appellees argued that Dudley "could obtain the credits and degree elsewhere and still obtain licensing").

45

Dudley's BSW degree is required to maintain her BSW license through IDOPL. *See* Idaho Code §54-3206.

Dudley "can make out a substantive due process claim if [she] is unable to pursue an occupation and this inability is caused by government actions that are arbitrary and lacking a rational basis." *Engquist v. Or. Dept. of Agriculture,* 478 F.3d 985, 997 (9th Cir. 2007); *see also Merritt v. Mackey*, 827 F.2d 1368, 1373 (9th Cir. 1987). Occupational liberty claims are limited to extreme cases, "such as a government blacklist […], much as if the government had yanked the license of an individual in an occupation that requires licensure." *Engquist,* 478 F.3d at 997–98 (quotations omitted).

Dudley alleged that BSU arbitrarily revoked her BSW degree without due process and informed IDOPL so that Dudley would lose her BSW license—making her unable to pursue her chosen occupation. *See* ER-156, 163, 176, 186 (¶¶90, 130, 183, 185, 199, 253, 256). It is reasonably inferred that Appellees' intent behind revoking Dudley's course credit and BSW degree, and expelling her, was to prevent her from being eligible for a BSW license. *See Id.*[16]

---

[16] IDOPL has changed attorneys multiple times since the inception of this case, and it has, for the time being, agreed to permit Dudley to maintain her BSW license pending the outcome of this appeal. IDOPL has unambiguously stated that it will proceed with revoking her BSW license in the event that she loses this appeal.

For the foregoing reasons, Dudley requests that the Ninth Circuit reverse the district court's decision.

## 4. <u>INSUFFICIENT PROCESS</u>

In its MTD Order, the district court identified that:

> [T]here are really two sequences of events at issue that Dudley challenges. The first is the revocation of her SOCWRK 481 grade which lead to the revocation of her bachelor's degree. The second is the Student Conduct Hearing which lead to Dudley's expulsion from BSU (and the inability to re-enroll).

ER-23. After concluding that graduates of Idaho's public universities do not have due process protected interests in their previously earned credits or degrees, the district court concluded that (1) Dudley was not entitled to notice or hearing prior to Dean Roark changing her grade and revoking her degree in violation of BSU policies nearly six months after Dudley had graduated because Dudley had an opportunity to appeal the decision afterwards (ER-23-25), and (2) the subsequent Student Conduct Process satisfied Dudley's due process rights without analyzing the *Mathews* factors to consider the sanctions of degree revocation and expulsion. ER-26-27. As set forth below, the district court's rulings should be reversed.

a. **<u>District Court Erred In Holding That Dean Roark Could Change Dudley's Grade, Leading to Revocation of Her BSW Degree, Without Notice Or Hearing.</u>**

The question at issue is whether the district court erred in ruling that Dudley was not entitled to a notice and hearing *prior* to Dean Roark disciplining Dudley by changing her final SOCWRK 481 grade in violation of BSU policies, leading to the revocation of her BSW degree six months after her graduation.

The Supreme Court has long held that "[w]hen protected interests are implicated, the right to some kind of prior hearing is paramount." *Board of Regents of State Colleges v. Roth*, 408 U.S. at 569–70. Emergency situations are the only exception. *See Id.* at 570, FN7; *Zinermon v. Burch*, 494 U.S. 113, 132 (U.S.Fla.,1990); *Bell v. Burson*, 402 U.S. 535, 542 (1971); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985).

Dudley alleged, and Appellees admitted, that Dean Roark changed Dudley's final SOCWRK 481 grade nearly six months after she graduated, leading BSU to revoke Dudley's BSW degree the following day. *See Id*.; ER-155-157 (¶¶84, 87-93). Both occurred prior to Dudley being provided any notice or hearing. ER-157 (¶93). Appellees did not argue that their failure to give prior notice and hearing was necessitated by an emergency. Rather, they argue that Dean Roark made an academic decision that did not require a prior notice or hearing as long as it was "careful and deliberate." *See* ER-86-87, 129-131. Dudley argued that Dean Roark's decision was disciplinary, and not academic, given that Dudley had already graduated and was no longer a BSU student, the language of his November 2nd Letter was clearly

48

disciplinary in nature, he usurped BSU's academic standards (Policy 3180 and 3130) to unilaterally impose punishment, and his decision was not careful or deliberate. *See* ER-99-103. Additionally, BSU conducted a subsequent Student Conduct Process on the exact same facts and alleged policy violations as Dean Roark that is undeniably disciplinary. *See e.g.* ER-155-156 (¶87); ER-159 (¶113).

The district court held that "regardless of whether Roark's decision was academic or disciplinary, the due process BSU afforded Dudley as to her grade change and the recission of her diploma was adequate" without citing case law supporting the conclusion that a disciplinary decision, which the district court was required to presume in deference to Dudley's allegations, could result in the deprivation of a protected interest prior to notice or a hearing. *See Twombly*, 550 U.S. at 555. Instead, the district court held that being provided the opportunity to appeal Dean Roark's decision after Dudley's grade had been changed and her BSW degree revoked as sufficient. ER-25.[17]

Dean Roark violated Dudley's right to due process by imposing discipline prior to notice or a hearing in the absence of an emergency. Accordingly, Dudley requests that the Ninth Circuit reverse the district court's decision.

---

[17] If necessary, Dudley would seek leave to amend her complaint to allege that Dean Roark's superiors denied her appeals without explanation—and without explaining how Dean Roark's conduct complied with BSU's policy on changing final grades.

**b. <u>Conduct Board's Sanction of Degree Revocation Was To Retroactively Ratify Dean Roark's Decision Under The Guise Of Providing Process.</u>**

While the Conduct Board purported to impose both degree revocation and expulsion on Dudley, Dudley's BSW degree had already been revoked as a result of Dean Roark's prior actions. *See* ER-155-156 (¶¶87-89); ER-23.

Dudley alleged that the purpose of BSU's Student Conduct Process was to retroactively ratify Dean Roark's decision to change Dudley's grade and revoke her BSW degree. ER-168 (¶155). This is reasonably inferred by the fact that Dean Roark instigated BSU's Student Conduct Process, his allegations were repeated nearly verbatim in AD Law's Notices and in the Conduct Board's Decision, and the only communication described in AD Law's Investigation Report between a BSU employee and an IDHW employee during the investigation was between Dean Roark and Chief Dixon prior to Dean Roark's November 2nd Letter.[18] ER-155-156, 159, 166-167 (¶¶87, 113, 149-150); *see also* ER-233. It is also reasonably inferred that the Conduct Board imposed the second extraordinary sanction of expulsion—given Dudley's status as a former student—because it wanted to prevent Dudley from undermining Dean Roark's punishment by preventing her from re-enrolling at BSU, retaking and passing SOCWRK 481, and re-earning her BSW degree. *See Id*.

---

[18] If necessary, Dudley would seek leave to amend her complaint to allege that the AD Law's reference to the email between Dean Roark and Chief Dixon in her Investigation Report.

Just as Dean Roark's violation of Dudley's due process rights cannot be rectified by a subsequent appeal process, neither can BSU use a subsequent process to analyze the same allegations and arrive at the same conclusions. *See Id*.; *see also Zimmerman v. City of Oakland*, 255 F.3d 734, 737-738 (9th Cir. 2001)(A state can only cure "an unconstitutional deprivation of 'life, liberty or property' by providing adequate postdeprivation remedies" when "prison officials acted in random, unpredictable, and unauthorized ways."). BSU's Student Conduct Process was not designed to be independent from Dean Roark's decision. ER-160, 168 (¶119, 155). Rather, it was designed to ratify and compliment it. *Id*.

For the foregoing reasons, Dudley requests that the Ninth Circuit reverse the district court's conclusion that Dudley was provided sufficient process through the Student Conduct Process.

### c. <u>The Student Conduct Process Was Fundamentally Unfair Considering The Extraordinary Sanctions Imposed.</u>

Even if the subsequent Student Conduct Process is viewed independently from Dean Roark's decision, it did not provide procedural safeguards appropriate for the extraordinary sanctions imposed on Dudley. At issue is whether the district court erred in ruling that Dudley was provided sufficient process without considering the *Mathews* factors in light of the expulsion and degree revocation that Dudley faced. *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).

51

The district court failed to contemplate that more significant sanctions typically require more process. *See Goss v. Lopez*, 419 U.S. 565, 584 (1975). Rather, the Court held:

> So long as BSU provides notice of the disciplinary action (which it did in this case) and an opportunity to be heard (again, satisfied here) and its process is "careful and deliberate" (which, by all accounts it was in this instance), the Fourteenth Amendment's Due Process considerations have been satisfied. Horowitz, 435 U.S., at 85.

ER-26. In *Mathews*, the Supreme Court held that "resolution of the issue whether the administrative procedures provided [ ] are constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Id.*, 424 U.S. at 334. The Court must consider three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335. Dudley's private interests that were affected by BSU's action were extraordinary—Dudley's loss of her BSW degree, which cost her significant time and resources to earn and is necessary for her career, and being sanctioned with expulsion, which substantially impacts Dudley's inability to continue her education. ER-106-107 (*citing* ER-145, 152, 155, 174-175 (¶¶26, 65, 84, 185, 186); Idaho Code

52

§54-3206. The risk of erroneous deprivation of Dudley's interests through BSU's Student Conduct Process was substantial, and BSU would not be significantly burdened by increased requirements. *Id*. The district court failed to address any of the specific deficiencies Dudley alleged regarding BSU's process. *See* ER-26; ER-105-111.

When the investigation and administration of a student disciplinary process is overtly biased, it collects evidence, interviews witnesses, drafts an Investigation Report, and makes procedural and administrative decisions in a manner that is designed to promote its predetermined conclusion—regardless of the truth. *See e.g. Powell v. Montana State University*, 2018 WL 6728061, at *7 (D.Mont., 2018)(unpublished) ("The Court, on the present record, cannot conclude […] that one or more of those involved in the investigation did not prejudge a material issue and thereby taint the entire investigation with bias."); *see also Doe v. University of Mississippi*, 361 F.Supp.3d 597, 610 (S.D.Miss., 2019). It is reasonably inferred that AD Law conducted her investigation and made procedural decisions, as set forth in more detail below, that were designed to minimize Dudley's chance of successfully defending herself or avoiding sanctions of expulsion and degree revocation that AD Law first informed Dudley she would be seeking during their very first conversation on November 29, 2022. *See* ER-158-162, 164-166, 168-169, 181 (¶¶109-111, 119-128, 136-148, 155-159, 228a-h). A biased investigation and administration of the

Student Conduct Process also fails to account for the unequal power dynamics between students and university administrators—who are more likely to successfully encourage or coerce witness cooperation than a student or former student. To require BSU to independently and impartially investigate student conduct cases would not be too fiscally or administratively burdensome—particularly when considering the private interests involved in degree revocation and expulsion. Allowing a Student Conduct Process to rely on evidence previously collected outside of the process by a BSU administrator who has already imposed punishment against the same student for the same allegations is likely to lead to the same outcome, regardless of the truth.

In the remainder of this section, Dudley explains the specific deficiencies that were caused by AD Law's biased investigation and administration of the Student Conduct Process.

Dudley alleged that she was denied adequate notice when AD Law (1) never informed Dudley of the specific underlying policies or laws forming the basis of AD Law's conclusion that Dudley had violated University Policy 2020 §4.AC— "Violation of University Policy and/or Law" (ER-159, 179-180 (¶¶113, 226.a)); (2) failed to provide any evidence in support of the April 12, 2022 date cited as the date of alleged violation in the Notices (ER-159, 161, 179-180 (¶¶113, 122, 226.b)); (3) failed to identify who, from the Office of the Dean of Students or IDHW, was involved in the investigation cited in the Notices (ER-159, 179-180 (¶¶113, 226.e));

54

and (4) failed to provide Dudley with the source or evidence establishing her conclusion that "[t]he date, time and file ID of each viewing was recorded in IDHW's system and subsequently documented by IDHW's IT department." ER-159, 179-180 (¶¶113, 226.d). *See Doe v. Purdue University*, 928 F.3d 652, 663 (7th Cir. 2019)(The Seventh Circuit held that withholding the evidence on which a University relied in adjudicating student's responsibility for policy violation was itself sufficient to render the process fundamentally unfair.); *Goss*, 419 U.S. at 581.

Insufficient notice can also arise when a Defendant makes assurances that have induced reasonable and detrimental reliance by a Plaintiff. *See Jones v. Board of Governors of University of North Carolina*, 704 F.2d 713, 717 (4th Cir. 1983) (citing *United States v. Caceres,* 440 U.S. 741, 752–53 & n. 15 (1979)). Here, Dudley alleged that AD Law misled her to believe that BSU would not seek specific sanctions, and that expulsion only applied to current students. ER-168, 179-180 (¶¶156-157, 226.f-g). Dudley also alleged that AD Law revised the Summary of Complaint shortly before the hearing to omit allegations that Dudley had violated "the School of Social Work's field requirements, the NASW Code of Ethics, the Student Professional Conduct and Professional Standards" leading Dudley to forego calling certain witnesses and preparing her defense with regards to those allegations. ER-166-167, 170, 179-180 (¶¶ 149-151, 170-171, 226.h).

Dudley alleged that AD Law and the Conduct Board deprived her of a meaningful opportunity to be heard given the *Mathews* factors and the significant sanctions. *See Mathews,* 424 U.S. at 333. Specifically, (1) AD Law denied Dudley's request for more than 25 minutes (10 minute opening, 10 minutes to question witnesses, and 5 minute summation) to present her entire defense to both liability and sanctions (ER-169, 171, 182 (¶¶158, 173, 233.a-b)); (2) all of BSU's witnesses presented written testimony containing vague, unsupported conclusions without being subjected to cross-examination when credibility was at issue[19] (ER-170-171, 182-183 (¶¶ 162-167, 174-177, 233.c)); and (3) AD Law expressly refused to testify about her Investigation Report. ER-169, 170, 182-183 (¶¶ 159, 166-169, 233.e). It was an impossible task for Dudley to spend the short amount of time available to present a defense against the allegations, point out the deficiencies and mischaracterizations in the Investigation Report; speculate about the underlying policies and laws that Chief Dixon and AD Law referenced but refused to identify or produce; address the evidence cited in the Notices that was never produced; explain why the Conduct Board should not simply take AD Law's word that the

---

[19] *See Black Coalition v. Portland School Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir. 1973) (The Ninth Circuit upheld ruling that "expulsion procedures were unconstitutional for failing to provide a hearing at which the student could […] crossexamine adverse witnesses."); *See also Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018); *Doe v. University of Sciences*, 961 F.3d 203, 215 (3rd Cir. 2020).

IDHW spreadsheet contained the redacted names of individuals AD Law specifically identified as proof of Dudley's alleged violations, while failing to explain why those same names could not be unredacted; and to argue against sanctions of expulsion and degree revocation; among many other things. *See e.g.* ER-159, 161-171 (¶¶113, 122, 124, 135, 136-141, 149, 152, 159, 166-169, 171-177).

Dudley alleged that AD Law denied her an <u>independent and unbiased investigation</u>, and that her Investigation Report was evidence directly relied on by the Conduct Board in its Decision as set forth in Policy 2020 §6.B.3. *See* ER-150 (¶¶51-52). Specifically, Dudley alleged that AD Law: (a) adopted unsupported allegations from Dean Roark's November 2nd Letter (ER-155-156, 159, 181 (¶¶ 87, 113, 228.a.)); (b) persuasively advocated against Dudley's positions in the Investigation Report (ER-161, 181 (¶¶123, 228.b.)); (c) failed to interview Dudley or consider any evidence or witnesses Dudley believed to be relevant (ER-159, 181 (¶¶110-111, 228.c.)); (d) withheld, mischaracterized, altered, and fabricated evidence against Dudley relevant to Dudley's defense (ER-161-162, 164-165, 181 (¶¶122, 125-126, 136-141, 146, 228.d-e)); (e) included assertions unrelated to the allegations that cast Dudley in a poor light (ER-161-162 (¶124)); and (f) the purpose of AD Law's investigation was to persuade the Conduct Board to find that Dudley engaged in the misconduct alleged by Dean Roark and arrive at the same conclusion (ER-168 (¶155)), among others. *See* ER-163, 181 (¶¶131-132, 228.f-h).

Given AD Law's use of bolding and italics in her Investigation Report to persuasively emphasize AD Law's belief that Dudley's conduct constituted a "***fireable offense***" and "*would have been reason for immediately ending her internship*" (*See* ER-161 (¶123)), it is unsurprising that the Conduct Board concluded the same:

> The Board has also concluded that your actions were an egregious violation of policy (and notably trust), and that subsequently your role in your internship would have been terminated prior to its completion if the supplemented information had been revealed. Consequently, you would have not passed your internship or earned your degree from Boise State University.

ER-174-175 (¶185). Given AD Law's purpose of ratifying Dean Roark's punishment of Dudley, and her deliberations with the Conduct Board, it is also unsurprising that the Conduct Board repeated the language from the AD Law's Notices and Dean Roark's November 2nd Letter, nearly verbatim, that Dudley's alleged conduct violated:

> [T]he School of Social Work's field requirements, the NASW Code of Ethics, the Student Professional Conduct and Professional Standards, IDHW's expectations for employees and interns, and state/federal privacy laws.

*See Id*. (¶¶184-185); ER-155-156 (¶87); ER-159 (¶113). Dudley alleged that Appellees denied her an impartial hearing that derived primarily from bias in the investigation and administration of the Student Conduct Process, and the Conduct Board's deference to AD Law. *See e.g. Walker v. City of Berkeley*, 951 F.2d 182,

58

184 (9th Cir. 1991); *Park v. Temple University*, 757 Fed.Appx. 102, 107–08 (3rd Cir. 2018)("In short, the pleading – if taken as true – plausibly alleges that Ismail desired to expel Park and so manipulated the proceedings to achieve and conceal that goal."). Among other things, the Conduct Board: (a) adopted the conclusions in AD Law's biased Investigation Report as evidence without subjecting AD Law to questioning at the hearing (ER-160-162, 164-167, 181-182 (¶¶118-124, 136-150, 230.a)); (b) adopted unsupported, conclusory statements from AD Law and BSU's witnesses without question (ER-163-164, 166-167, 170, 181-182 (¶¶134-135, 149, 152, 162-169, 230.c-d)); (c) allowed AD Law to deliberate with the Conduct Board despite her advocacy for DOS Complainant (ER-174, 181-182 (¶¶184, 230.e));[20] (d) failed to ask DOS Complainant any questions while spending a significant time questioning Dudley and expressing skepticism of her defense (ER-172-174, 181-182 (¶¶180-182, 230.f-g)); and (e) the decision was sent to Dudley, and likely drafted, by AD Law. ER-174-175, 181-182 (¶¶185, 230.f-g).

Dudley alleged that the Conduct Boards' Decision was <u>arbitrary and capricious</u>. *See Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990); *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970); *Ohio Bell Tel. Co. v. Public Utilities Commission of Ohio*, 301 U.S. 292, 302 (1937).

---

[20] It can be reasonably inferred that the Conduct Board Members discussed the case with AD Law during deliberations. *See* ER-174 (¶184).

Specifically, Dudley alleged that the Decision: (a) failed to identify the underlying policies and laws that it concluded established a violation of Policy 2020 §4.AC (ER-174-175, 183 (¶¶185, 235.a)); (b) failed to contain a description of the procedural steps taken, identify evidence in the record, or make a credibility assessment (ER-174-175, 183 (¶¶185, 235.b-c, 235.e-g); (c) failed to identify when the violation allegedly occurred, or narrow consideration of the alleged violation to the date set forth in the Notices (ER-174-175, 183-184 (¶¶185, 235.d, k)); and (d) failed to identify the factors required for sanctions (ER-174-175, 183-184 (¶¶185, 235.h-i)); among others. *See* ER-152, 174-175, 183-184 (¶¶64, 185, 235-237).

Dudley sufficiently alleged that the Student Conduct Process was designed to retroactively ratify Dean Roark's earlier decision to change Dudley's SOCWRK 481 grade and revoke Dudley's BSW degree. ER-168 (¶155). The district court rejected Dudley's contention and adopted Appellants' position. *See* ER-27 (fn23).

Providing Dudley with a fair process without the deficiencies described above, would not create significant fiscal or administrative burdens in the rare cases where students are facing degree revocation and/or expulsion. Doing so would substantially reduce the likelihood of an erroneous outcome, and it would be in Dudley's interest, BSU's interests, and BSU students' interest.

For the foregoing reasons, Dudley respectfully requests that the Ninth Circuit reverse the district court's decision.

### 5. **QUALIFIED IMMUNITY**

Appellees limited their qualified immunity argument to whether it was clearly established that Dudley had alleged a property or liberty interest. *See* ER-135. The district court alternatively concluded that Defendants were entitled to qualified immunity, stating "[i]f the Court had a difficult time culling through the legal landscape to determine whether Dudley had a property interest at stake in the first place, it would appear to be self-evident that the right was not clearly established." ER-29. The district court correctly identified that Appellees are not entitled to qualified immunity regarding Dudley's request for injunctive relief, despite its mistaken holding that Dudley was not entitled to injunctive relief, which is addressed below. *Id*.; *See also Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012).

While the operative facts behind each Appellee's action that constituted a violation of Dudley's due process rights would vary under a typical qualified immunity analysis regarding Appellees' conduct, whether it was clearly established to each Appellee that Dudley had a property interest is the same among all Appellees.

Dudley must show that her property interests were "clearly established at the time of the challenged conduct." *See City of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 610 (2015)(citation omitted). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Sheehan*,

61

575 U.S. at 610. When disputed facts are necessary for the determination of qualified immunity, the facts must first be established by a jury. *See Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017); *Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019).

Here, the relevant inquiry "is whether it would be *clear* to a reasonable official" in Appellees' positions as early as November of 2022, that Appellees could not deprive Dudley of her final SOCWRK 481 grade, her BSW degree, in BSU's disciplinary process, or her potential enrollment at BSU in the absence of "for cause" reasons for doing so. *See Saucier v. Katz,* 533 U.S. 194, 202 (2001)(emphasis in original).

The Supreme Court has clearly established that when a government benefit "cannot be removed except 'for cause,'" an individual has a property interest protected by the Due Process Clause. *See Roth,* 408 U.S. at 577; *Sindermann,* 408 U.S. at 601; and *Logan*, 455 U.S. at 430; *Barnes*, 669 F.3d at 1307; *Merritt v. Mackey*, 827 F.2d 1368, 1373 (9th Cir.1987); *Strosnider v. City of Nampa*, 196 F.Supp.3d 1159, 1169 (D.Idaho, 2016).

ISBOE Policy §III.B.2.iii.3 states that "[i]n matters of disciplinary action, students have the right to due process and to be held accountable using academic standards and institutional procedures." ER-145 (¶24). University Policies, syllabi, written and verbal expectations from faculty, and other university publications, which constitute "academic standards and institutional procedures," clearly

established the "for cause" reasons and procedural requirements that limited BSU's ability to discipline Dudley (*See* University Policy 2020 §4), change Dudley's grade (*See e.g.* University Policies 3130, 3180, 2020§2.C.3, 2020§8.A.2), revoke Dudley's degree (*See e.g.* University Policy 2020§1.D., 2020§7.B., 2020§7.B.14), or expel Dudley (*See* University Policy 2020 2020§7.B.). *See* ER-145-146, 151-152, 155 (¶¶29, 31-34, 62-64, 78, 79).

For the above-mentioned reasons, it was clearly established, by November of 2022 and all relevant times thereafter, to any reasonable person in Appellees' shoes that Dudley had a property interest in her SOCWRK 481 grade, BSW degree, BSU's disciplinary process, and in her potential future enrollment at BSU in the absence of "for cause" reasons. Accordingly, Dudley respectfully requests that the Ninth Circuit to reverse the district court's decision.

### 6. **PERMANENT INJUNCTIVE RELIEF**

The district court denied Dudley's claim for injunctive relief, asserting that "Dudley has failed to allege facts sufficient to state a plausible procedural due process claim against Defendants that entitles her to any relief," and, accordingly, her claim injunctive relief should be denied. ER-29. For the reasons set forth above, Dudley respectfully requests that this Court reverse district court's decision with regards to Dudley's claim for injunctive relief, and if necessary, order the district

court to grant Dudley leave to amend her Complaint to specifically allege how the facts support each element required for injunctive relief.

### 7. PRELIMINARY INJUNCTIVE RELIEF

#### a. Standard of Review

A district court's denial of a preliminary injunction is reviewed for abuse of discretion. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). Abuse of discretion occurs when the district court bases its decision "on an erroneous legal standard or on clearly erroneous factual findings." *Id.* (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022)). A district court bases its decision on an erroneous legal standard if it fails to use the appropriate legal standard for preliminary injunctions or if it "misapprehend[s] the law with respect to the underlying issues in the litigation." *Id.* (quoting *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1096 (9th Cir. 2008)).

#### b. Argument

The legal standard for analyzing a preliminary injunction is to determine whether the movant has established that "(1) [s]he is likely to succeed on the merits of [her] claim, (2) [s]he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in [her] favor, and (4) a preliminary injunction is in the public interest." *Id.* "It is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury."

64

*Id.* "If a plaintiff in such a case shows [s]he is likely to prevail on the merits, that showing usually demonstrates [s]he is suffering irreparable harm no matter how brief the violation." *Id.* Dudley's "likelihood of succeeding on the merits also tips the public interest sharply in [her] favor because it is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Id.* (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022)).

The district court abused its discretion by basing its decision on both "an erroneous legal standard" and "on clearly erroneous factual findings." *See Baird*, 81 F.4th at 1040.

Dudley's appeal of the TRO Extension Denial pertains to the district court's refusal to reinstate Dudley's BSW degree, as well as the subsequent Student Conduct Process, as set forth in Argument §4 of this brief, above. Dudley recognizes that, procedurally, the district court's TRO Extension Denial occurred before the Student Conduct Hearing, and that Dudley is now asking the Ninth Circuit to reverse the district court's decision afterwards.

The clear errors set forth in the district court's TRO Extension Denial, however, emboldened BSU to provide the type of bare-minimum process that might be appropriate for a short suspension, but that was entirely insufficient for someone

65

facing expulsion and degree revocation at the Student Conduct Hearing.[21] *See* ER-46-47; *see also Goss v. Lopez*, 419 U.S. 565 (1975); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The Court also erroneously cited the "careful and deliberate" standard set forth in *Horowitz* that applies to academic, and not disciplinary decisions. *See* ER-43, 46, 47; *See also Horowitz,* 435 U.S. at 87.

The court determined that Dudley's can be deprived of her course credit and BSW degree "while she goes through the process." ER-45. The court's ruling that it could not "say at this stage that Dudley has shown a likelihood of success on her due process claim as it relates to the grade change / diploma recission when the process is, frankly, ongoing" (ER-44) is a misapplication of one of the most fundamental aspects of due process jurisprudence—that due process requires notice and hearing *before* deprivation of a protected interest. *See e.g. Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Roth,* 408 U.S., at 569–570; *Sindermann,* 408 U.S. at 599.

When credibility is at issue, students have a right to cross-examine witnesses against them in disciplinary proceedings. *See Black Coalition v. Portland School Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir. 1973); *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018); *Doe v. University of Sciences*, 961 F.3d 203, 215 (3rd Cir. 2020).

---

[21] Despite the TRO Extension Denial, Dudley informed the district court that she was facing expulsion and degree revocation at the Student Conduct Hearing. *See* ER-469; ER-488 (¶45); ER-533 (9:11-22).

Credibility was at issue, here. *See* ER-171 (¶¶174-177). The district court clearly erred by implying that Dudley's right to cross-examine BSU's witnesses was dependent on whether BSU's witnesses were willing to testify. *See* ER-47. The district court's ruling provided, erroneously, the perception of legal authority that likely emboldened AD Law and Chief Dixon to expressly refuse to testify when Dudley asked them to do so. *See* ER-47; ER-169-170 (¶¶159, 164-168).

While the district court acknowledged that "it appears Defendants *may* have circumvented certain provisions of [Policy 3180]," it clearly erred in concluding that the "full text of University Policy 3180 is not in the record" and "[t]he Court simply does not know" whether there are other policies that might have authorized Dean Roark's change of Dudley's final SOCWRK 481 grade six months after Dudley had graduated. ER-44 (emphasis in original). A complete copy of Policy 3180 was in the record. ER-412-414. Appellees never argued that the copy of Policy 3180 provided by Appellant was inaccurate or incomplete, nor did they submit any other policies that authorized Dean Roark's conduct. *See* ER-189-203. Policy 3180 is the only BSU policy that sets forth the procedure for changing a final grade, and Dean Roark unequivocally violated it so Dudley's BSW degree would be revoked. *See* ER-412-414; ER-155-157 (¶¶87-93).

It is likely that Dudley will succeed on the merits of her due process claims in light of the undisputed fact that Dudley was provided no notice or opportunity to

67

defend herself prior to her course credit and BSW degree being revoked and the substantial deficiencies of the Student Conduct Process, as set forth above. Presumably, Registrar Nelson can reinstate Dudley's BSW degree as easily as she revoked it, and given BSU's conduct, the balance of equities and the "public interest to prevent the violation of a party's constitutional rights" requires it to do so. *Baird*, 81 F.4th at 1040; *Riley's Am. Heritage Farms*, 32 F.4th at 731.

The Court's factual and legal conclusions were clearly erroneous and had no basis in the record or applicable case law. For the reasons above, as well as the reasons set forth in the "Statement of the Case" §2 and "Argument" § 4, Dudley requests that the Ninth Circuit reverse the district court's decision and order BSU and Registrar Nelson to reinstate Dudley's degree unless and until degree revocation results from a process that satisfies Dudley's due process rights.

## CONCLUSION

For the reasons set forth above, the district court's decision to grant Defendant/Appellees' Motion to Dismiss and its decision denying the extension of the TRO/Preliminary Injunction requiring BSU to reinstate Dudley's BSW degree should be reversed.

DATED this 9th day of September, 2024.

Fisher Hudson Brown Horton


*/s/ Jeremiah M. Hudson*
Jeremiah M. Hudson – Of the Firm
*Attorney for Appellant/Plaintiff*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, I state that I am not aware of any other cases that are related to this appeal.

Signature: */s/ Jeremiah Hudson*      Date: 09/09/204

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number 24-3233**

I am the attorney for Plaintiff-Appellee, Chelsey Dudley.

This brief contains 13,999 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

Signature: */s/ Jeremiah Hudson*      Date: 09/09/204


## CERTIFICATE OF SERVICE

**9th Cir. Case Number 24-3233**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

Signature: */s/ Jeremiah Hudson*      Date: 09/09/204